**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | | |
|---|---|---|
| JEREMY TAYLOR,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CORDELE, GEORGIA and JOSHUA DERISO, *in his individual capacity*,<br><br>Defendants. | : | CASE NO.: 1:24-CV-00028 (WLS) |

**<u>ORDER</u>**

Defendants City of Cordele and Joshua Deriso move for summary judgment ("Motion") (Doc. 31). After review, the Motion is **GRANTED**.

## I. RELEVANT PROCEDURAL BACKGROUND

Plaintiff filed this lawsuit in February 2024 and amended his complaint two months later. (Docs. 1 & 8). The Amended Complaint ("Complaint") (Doc. 8) names Defendants City of Cordele and Joshua Deriso in his individual capacity. Plaintiff asserts claims under 42 U.S.C. §§ 1981 and 1983 against Deriso. Plaintiff asserts claims under 42 U.S.C. § 1981 and the Fourteenth Amendment through 42 U.S.C. § 1983 and 42 U.S.C. § 2000 (Title VII) for Intentional Race Discrimination and Retaliation, all against the City of Cordele. (Doc. 1 ¶¶ 63–95). Defendants moved for summary judgment on all counts (Doc. 31), Plaintiff responded (Doc. 34), and Defendants replied. (Doc. 58). In his reply, Plaintiff waives his retaliation claims, stating that he "learned that Chief Heard did not know about Plaintiff's Charge of Discrimination at the time he decided not to restore Plaintiff to the rank and position of Major/Deputy Chief." (Doc. 34 at 1). Accordingly, Defendants' Motion is **GRANTED** as to Count IV.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). [1]

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."

[1] Local Rule 56 requires the movant for summary judgment to attach to the motion a separate statement of the material facts about which the movant contends there is no genuine dispute. M.D. Ga. L.R. 56. The respondent shall attach to its response a separate statement of material facts to which respondent claims there exists a genuine dispute. *Id.* The respondent shall also respond to each of the movant's numbered material facts. Here, Plaintiff and Defendants both comply with Local Rule 56.

*Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322–24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation marks omitted). To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587–88; *Allen,* 121 F.3d at 646. Yet the Court must grant summary judgment if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## III. Factual Background

Plaintiff is a white male who worked for the Cordele Police Department.[2] (Docs. 31-1 ¶ 7 & 34-2 ¶ 1). Eventually, he reached the rank/title of captain/administrative commander. (Doc. 31-1 ¶ 31). Meanwhile, Defendant Joshua Deriso, a Black male and, at the time, a private citizen, campaigned for Chairman of the City Commission, stating the city needed "More Blacks!!!" and "We need a city manager that works for the people of Cordele that looks like you and I. We need a chief of police that understands what it is like to be Black." (Doc. 34-1

[2] If a fact is undisputed by Plaintiff, the Court relies on Defendants' Statement of Undisputed Material Facts (Doc. 31-1) for relevant propositions. If Plaintiff disputes a fact, the Court relies on Plaintiff's Responses and Objections to Defendants' Statement of Material Facts as to which There is No Genuine Issue to be Tried. (Doc. 34-1). To fill in some details, the Court also relied on Plaintiff's Statement of Disputed Material Facts. (Doc. 34-2).

¶ 36). Deriso won his election on November 30, 2021, and was sworn into office on January 4, 2022. (Doc. 31-1 ¶ 38).

On January 4, 2022, the City Commission voted to remove City Manager McCarthy, a white male, and appoint Angela Redding, a Black woman, as the new City Manager. (Doc. 31-1 ¶ 39). In his function as Chairman, Deriso did not take part in the vote to remove McCarthy. (Doc. 34-1 ¶ 41).

On February 17, 2022, Mike Hathaway announced his resignation as Police Chief. (Doc. 31-1 ¶ 46). The same day, Captain Jalon Heard submitted a letter of resignation effective February 18, 2022; Heard later delayed his resignation and eventually withdrew the letter. (*Id.* ¶¶ 47, 61, 70). At the time, there were three equally ranked Captains: Plaintiff, Farrow, and Heard. (*Id.* ¶¶ 30, 45). That same day, Ms. Redding met with Captain Scott Farrow, a white male.[3] In that meeting, Farrow expressed his clear desire to not serve as interim Police Chief and recommended Jalon Heard and Plaintiff for the position. (*Id.* ¶ 49). Redding asked Captain Heard to be interim Police Chief because all of her interactions at that point had been with Captain Heard, and she had heard Chief Hathaway call Heard his "next in line."[4] (*Id.* ¶ 50).

[3] Plaintiff disputes Defendants' claim that Ms. Redding asked Captain Scott Farrow to serve as interim police chief, citing to Farrow's declaration wherein he said, "I do not remember Ms. Redding offering me the position. I don't remember the exact words of the conversation, but I got the impression that she may ask me to serve as interim Police Chief. I do recall that I made clear to her that I did not want to be interim Police Chief." (Doc. 34-1 ¶ 49). Meanwhile, Redding stated unequivocally that "I asked [Farrow] if he would be the Acting Police Chief, the Interim Police Chief." (Doc. 39 at 25). The Court's role is to consider undisputed material facts and make reasonable inferences regarding disputed facts for the nonmovant. The Court must reasonably infer that Redding did not ask Farrow to be interim Police Chief. However, the Court may reasonably infer, based on Redding's deposition, that she met with Farrow with the purpose of asking him to be interim Police Chief and that early in that meeting, Farrow expressed that he did not want to be interim Police Chief.

[4] Plaintiff makes two arguments against the Court's consideration of this fact. Neither are persuasive. First, Plaintiff argues "[t]he true reason Redding appointed Heard Interim Chief is the crux of this suit and cannot be discerned from the cited testimony." (Doc. 34-1 ¶ 50). Ignoring this fact because it is at the heart of the suit undermines the Court's ability to engage with the *McDonnell Douglas* framework, a framework the Plaintiff argues he succeeds under, because that framework requires the Court to consider Defendants' articulation of a "legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The Court cannot and will not ignore Defendants' offer of a legitimate, nondiscriminatory reason simply because that offer is "the crux of this suit," or in other words, a relevant fact to the summary judgment analysis. And the Court easily discerns Redding's stated reason for appointing Heard interim Chief from her testimony: she states it plainly and clearly in her deposition. (Doc. 39 at 26-27) ("[T]he reason why is because when I came on board and Chief Hathaway was the Police Chief, all my interactions had been with Captain Heard, whether it was community meetings, meetings where . . . Chief Hathaway was there, Captain Heard would always be with him. And in my conversation with Chief Hathaway, he had said that Captain Heard was like his next in line.").

Also that day, Deriso met with Redding and Heard and expressed it was a "good day" because he felt Heard had previously been denied the chief position because of his race and now Heard could serve as chief. (*Id.* ¶ 51). Redding maintains it was her decision to name Heard as interim Chief, regardless of what others had told her.[5] (*Id.* ¶ 53). Later that evening, Redding emailed the City Commissioners that Heard would serve as Acting Chief today and tomorrow. (*Id.* ¶ 55).

Meanwhile, Plaintiff assumed he would be named interim Chief, despite no one explicitly telling him he would be in charge. (Doc. 31-1 ¶ 56). Plaintiff believes Redding chose Heard "because of color" and that he "couldn't think of another reason unless—and she—unless she doesn't understand how command staff and chain of command and—and ranks work as far as leadership skills." (Doc. 34-1 ¶ 57).

The City created a job posting for the Chief of Police position and posted it both internally and externally on February 18, 2022. (Doc. 31-1 ¶ 64). Plaintiff and Heard both applied for the position. (*Id.* ¶¶ 66, 70). Redding created an anonymous survey which she sent out to the entire police department, excluding candidates for Chief, asking employees what kind of qualities they would like to see in the next Chief of Police. (*Id.* ¶ 68). Some employees used that survey to express their opinions and preferences on who should be the next Chief. (*Id.* ¶ 69). Those unsolicited recommendations included recommendations of Plaintiff and Heard. (*Id.*)

The City received over fifty applications for Chief and narrowed the candidates down to five finalists, including Plaintiff and Heard. (Doc. 31-1 ¶ 73). Of those five candidates,

---

Second, Plaintiff argues the "next in line" quote is inadmissible hearsay. (Doc. 34-1 ¶ 50). "[E]vidence need not be admissible to be considered at the summary judgment stage, it must be capable of being submitted in admissible form at trial." *Anthony v. Georgia Dep't of Pub. Safety*, No. 119CV05303SDGLTW, 2021 WL 4438082, at *3 (N.D. Ga. Sept. 28, 2021) (citing *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996)). Defendants correctly point out that the statement may be admitted as original evidence because it contains a fact which "explain[s] conduct, ascertain[s] motives, or illuminate[s] reasons for action." *Watts v. Allstate Ins.* Co., No. 4:13-CV-0245-HLM, 2015 WL 13403788, at *2 (N.D. Ga. Mar. 9, 2015). Redding's statement explains her motive for appointing Heard interim Chief and is therefore admissible for the Court's consideration of Defendant's motion.

[5] Plaintiff objects to the Court's consideration of this fact for the same "crux of this suit" argument the Court rejected in the previous footnote. Because Plaintiff does not put forward evidence disputing this fact and for the reasons discussed previously, the Court rejects this argument and will consider Redding's deposition testimony.

Plaintiff was the only white person. (Doc. 58-1 ¶ 46). The only City personnel who reviewed applications were Redding and Human Resources Director David Wade. (Doc. 31-1 ¶ 74). Neither Redding nor Wade knew the races of the five people selected as finalists, excluding Plaintiff and Heard. (*Id.* ¶ 75). Plaintiff admits it was reasonable for the City to consider Heard as a candidate for Chief but maintains he was more qualified than Heard. (Doc. 34-1 ¶ 76).

All five interviews occurred on a single day, conducted by a ten-person interview panel which included seven white people and three Black people. (Doc. 31-1 ¶¶ 77–78). Some interviewers were City personnel, others were not. (*Id.* ¶ 78). Chairman Deriso was not on the interview panel, he did not know who was on the panel, and he did not have discussions with any panelist about the Chief opening. (*Id.* ¶ 79). The panel interviewed four candidates and the fifth was a no-show. (*Id.* ¶¶ 81–82). Afterward, the interview panel gathered to discuss the candidates and unanimously selected Heard as their top choice for Chief. (*Id.* ¶¶ 83–84). Many panelists knew Heard was interim Chief. (Doc. 34-1 ¶¶ 85–94). The panelists agreed their choice of Heard had nothing to do with race, excluding panelist Wells who stated he "would prefer if [the Chief] was a Black man." (*Id.* ¶ 95). Redding considered the input from the panelists and appointed Heard as the permanent Police Chief. (Doc. 31-1 ¶ 94).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on each of Plaintiff's claims. (Doc. 31). The Court addresses each argument in turn.

### A. Liability for Race Discrimination

Defendants argue there is no evidence from which a reasonable jury could determine race was a factor in the City's promotional decisions. (Doc. 31-2 at 3). Plaintiff disagrees, and the Parties make these arguments under the three ways to show race discrimination and survive summary judgment: the *McDonnell Douglas* framework, the "convincing mosaic" metaphor[6], and the "cat's paw" theory of liability, used as direct evidence of race discrimination.[7] (Doc. 31-2 at 3, 15); (Doc. 34 at 6).

---

[6] "'[C]onvincing mosaic' is a metaphor, not a legal test and not a framework." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023).

[7] The Eleventh Circuit has "never applied the cat's-paw theory to a direct-evidence claim," which is what Plaintiff attempts to do here. *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1301 (11th Cir. 2023).

1. *Plaintiff's Claims Fail Under* McDonnell Douglas *Framework*

In *McDonnell Douglas*, the Supreme Court prescribed "a burden shifting framework designed to draw out the necessary evidence in employment discrimination cases." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The framework has three steps. *Id.* First, Plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.* He may do this by showing that (1) he belongs to a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified to perform his job, and (4) his employer treated "similarly situated" employees outside of his class more favorably. *See Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1221 (11th Cir. 2019) (quoting *McDonnell Douglas*, 411 U.S. at 802). If Plaintiff makes out a prima facie case, the burden shifts to Cordele "to articulate a legitimate, nondiscriminatory reason for its actions." *See id.* (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). If Cordele does so, the burden reverts to Plaintiff to show that Cordele's "proffered reason was merely a pretext for unlawful discrimination[.]" *Id.* (alterations omitted) (quoting *Burdine*, 450 U.S. at 256). This obligation merges with Plaintiff's "ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Id.* (alteration in original).

Defendants do not dispute that Plaintiff makes out a prima facie case, instead focusing their argument on Plaintiff's inability to show that Cordele's legitimate, nondiscriminatory reason for its actions was pretextual. (Doc. 31-2 at 5–6). The Parties address this argument as applied to both the interim Chief appointment and the permanent Chief appointment. Accordingly, the Court addresses each in turn.

**a. Interim Chief Appointment**

Defendants state Redding selected Captain Heard to serve as interim Chief because Chief Hathaway referred to Heard as his "next in line" and all of Redding's interactions, whether at community meetings or meetings with Chief Hathaway, had been with Captain Heard. (Doc. 31-1 ¶ 50). The burden of providing legitimate, nondiscriminatory reasons for

---

The Court need not reach the question of whether the cat's paw theory may show direct evidence of discrimination because Plaintiff's cat's paw theory ultimately fails.

Defendants' action is "exceedingly light." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994). Accordingly, Defendants have met their burden for purposes of this stage.

The burden now shifts to Plaintiff to show the decision to appoint Heard interim Chief was pretextual. The Court "must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1305 (11th Cir. 2023) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). "However, the plaintiff cannot merely quarrel with the wisdom of the employer's reason, but 'must meet that reason head on and rebut it.'" *Licausi v. Symantec Corp.*, 378 F. App'x 964, 966 (11th Cir. 2010) (quoting *Chapman*, 229 F.3d at 1030). Furthermore, "a plaintiff cannot prove pretext merely by arguing or showing that he was more qualified than the person who received the position . . . plaintiff 'must show that the disparities between the successful applicant's and his own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Id.* (quoting *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)).

Redding chose Heard, one of the three equally ranked Captains to serve as interim Chief. And she did so after she met with Farrow, with the purpose of asking him to serve, and he expressed a disinterest in the position and recommended the two other equally ranked Captains be chosen. Plaintiff attacks this reasoning by arguing that "[i]f Redding really believed that Heard was 'next in line,' she would have no reason to consult with Captain Farrow." (Doc. 34 at 13). Defendants reply by arguing Redding went to Farrow first because Heard had submitted a resignation letter. (Doc. 58 at 8). As Defendants tell it, Redding's first choice was Heard, a Black man, but she asked Farrow, a white man, first because Heard had submitted a resignation letter. Taken together, these facts undermine Plaintiff's theory of race discrimination: Redding was willing to appoint a white man as interim Chief, just not Plaintiff. But the application of these facts to the *McDonnell Douglas* framework is what matters: Plaintiff has not demonstrated such weaknesses, implausibilities, or contradictions significant enough that a reasonable factfinder could find them unworthy of credence. The identified contradiction is mild and easily explained by Redding's preference for either Farrow or Heard

over Plaintiff. And Plaintiff does not dispute the fact that he, Farrow, and Heard were all equally ranked Captains. As such, he has failed to show his qualifications so severely surpassed Heard's such that no reasonable person could have chosen Heard over Plaintiff.

Plaintiff submits some stray remarks from Deriso as evidence of pretext. But Redding maintains it was her decision to name Heard as interim Chief, regardless of what others had told her. And Deriso had no role in the interim appointment process. Plaintiff's only real evidence as to remarks which may have influenced Redding's decision making are Deriso's statement that he believed past racism had resulted in Hathaway (white) being Chief and that the next Chief should be Black. (Doc. 34 at 13–14). The Eleventh Circuit has previously said that stray remarks by nondecisionmakers are not sufficient to "justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)). And in cases where a nondecisionmaker made a discriminatory comment, it was insufficient to satisfy the plaintiff's burden of proving a discriminatory motive. *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 962 (11th Cir. 1997). In sum, Plaintiff has failed to present evidence of pretext sufficient to fulfill the *McDonnell Douglas* framework. Under the *McDonnell Douglas* framework, Plaintiff's claims regarding the interim Chief appointment fail.

**b. Permanent Chief Appointment**

Plaintiff's claims regarding the permanent Chief position also fail to fulfill the requirements of the *McDonnell Douglas* framework. Again, the Parties do not appear to dispute that Plaintiff has made out a prima facie case. As to the permanent Chief appointment, Defendants' legitimate non-discriminatory reasons center on the interview panel's unanimous selection of Heard for permanent Chief. (Doc. 31-2 at 7); (Doc. 31-1 ¶¶ 83–84). Plaintiff's response to this offered reason does not exactly show pretext: Plaintiff argues that because the panelists knew Heard was interim Chief, their choice was "taint[ed]." (Doc. 34 at 14). This argument is unpersuasive for three reasons: First, knowledge that Heard was interim Chief is a fact completely divorced from any race discrimination. When an interview panelist chose Heard over Plaintiff because of Heard's status as interim Chief, that panelist was not discriminating on the basis of race. Second, Plaintiff seems to argue that because the interim

Chief appointment was racially motivated, the taint of racial discrimination spread to the permanent Chief appointment. (Doc. 34 at 14). This argument takes for granted that the interim Chief process was affected by race discrimination. In effect, Plaintiff bases the success of this argument on the success of an argument the Court ultimately rejects. As a result, this argument fails. Third, Plaintiff argues that Cordele ultimately acknowledged that interviewers are generally biased in favor of an interim Chief because in a later permanent Chief selection process, Redding chose a third-party, non-candidate interim Chief so as to not give an advantage to the candidates seeking the permanent Chief position. (*Id.*) Indeed, it seems Defendants admit an interim Chief is advantaged in the permanent Chief selection process, and Heard likely benefitted accordingly. But that advantage is not a form of racial discrimination, nor did it come from racial discrimination, as discussed above. In sum, Plaintiff offers no weaknesses, implausibilities, or inconsistencies with this decisionmaking. Accordingly, Plaintiff has failed to rebut Defendants' legitimate, non-discriminatory reason of relying on the interview panelists' unanimous decision by showing the reason was pretextual.

2. *Plaintiff's Claims Fail to Show a Convincing Mosaic of Discrimination*

The Court next evaluates whether Plaintiff has shown a convincing mosaic of circumstantial evidence sufficient to sustain his claims for race discrimination. "[A] 'plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent' and [] that a 'triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Ismael v. Roundtree*, 161 F.4th 752, 760 (11th Cir. 2025) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Plaintiff may show "[a] 'convincing mosaic' . . . by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (alteration in original) (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)). This evidence must allow a jury to reasonably infer that Plaintiff's protected characteristic was a but-for cause of Defendants'

intentional discrimination. *See Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1197 (11th Cir. 2024) (citing *Lewis*, 934 F.3d at 1185).

Defendants argue Plaintiff fails to make out a convincing mosaic of discrimination, largely by citing back to their arguments regarding the *McDonnell Douglas* standard and the now-moot retaliation claim. (Doc. 31-2 at 15). Plaintiff responds by citing to Deriso's campaign statements, Plaintiff's "superior qualifications and experience," and a supposedly tainted interview process. The Court again considers Plaintiff's arguments and facts separately for the interim Chief and permanent Chief appointment. However, because the convincing mosaic metaphor is something akin to considering the totality of the circumstances, the Court also considers the weight of the cumulative facts and arguments and the possibility that, taken together, Defendants' actions during both the interim and permanent Chief selection process could produce a convincing mosaic of discrimination.

**a. Interim Chief Appointment**

Plaintiff points to the fact that Deriso ran a political campaign centered on replacing white employees with Black ones as evidence of racial discrimination in the interim and permanent appointment of Heard as Chief. (Doc. 34 at 8–9). Defendants reply by stating Deriso had no role in the selection process for interim Chief. (Doc. 58 at 5). Deriso's comments clearly demonstrate a desire to racially discriminate in the appointment process for both interim and permanent Chief positions. (Doc. 34 at 8–9). But the appointment decision was Redding's alone. And Redding stated she made her decision without regard to what others may have told her at the time. (Doc. 31-1 ¶ 53). Plaintiff cannot overcome the fact that Redding, and Redding alone, made the interim Chief appointment decision. And as discussed above, stray comments by a nondecisionmaker are insufficient to show racial discrimination. *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990). At most, Plaintiff may argue that Deriso's comments, which came before Heard's appointment, serve as suspicious timing from which an inference of discrimination may be made. *Lewis*, 934 F.3d at 1185. Indeed, this timing would be suspicious, if Deriso played a role in the appointment process. But he did not. And Plaintiff has not put forward evidence that Deriso had any sway over

Redding strong enough to make his statements suspicious.[8] Plaintiff is adamant Deriso had some power over the appointment process that he plainly lacked, and consequently Plaintiff fails to create a triable question of fact from which a reasonable jury could find discrimination.

Plaintiff next argues his qualifications are sufficiently superior to Heard's, such that Redding would have chosen Plaintiff but for his race.[9] (Doc. 34 at 9). However, "a plaintiff cannot prove pretext merely by arguing or showing that he was more qualified than the person who received the position." *Licausi v. Symantec Corp.*, 378 F. App'x 964, 966 (11th Cir. 2010). Instead, Plaintiff "must show that the disparities between the successful applicant's and his own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Springer*, 509 F.3d at 1349. Plaintiff's qualifications which he argues place him superior to Heard are that "he attended Chief School, he had been with the Cordele Police Department for eighteen years, and he had been on the Cordele Police Department Command Staff for many years." (Doc. 34 at 9). But none of these proffered qualifications are of such significance, or so undeniably remarkable such that no reasonable decisionmaker could pass over an individual who possesses them. In fact, all three could be viewed as liabilities to a City Manager.

As to Plaintiff's long tenure with the police department, if the City Manager were obligated to simply promote the most tenured Captain to Chief, then her role in the selection would be *pro forma*. But that is not the process here. Accordingly, Plaintiff's tenure is a qualification, but far from one of such weight and significance that no reasonable person could have passed over Plaintiff. In fact, tenure may be a significant disqualification to a City Manager who wishes to radically restructure the police department, buck tradition, and usher in some new era of policing. At best, Plaintiff's lengthy tenure is a wash: it could be an asset or a liability, depending on the City Manager. Similar considerations apply to Plaintiff's attendance at Chief School: it is unlikely that all individuals who attend Chief School become Chief of their departments, and it would be an unwieldy threat to a City Manager's authority

---

[8] The Court addresses the insufficiency of Plaintiff's arguments that Deriso was able to influence Redding in its discussion of the cat's paw theory of liability.

[9] It appears Plaintiff is making a pretext argument here, which can be a valid part of a convincing mosaic of discrimination.

if she was obligated to appoint all graduates of this program to Chief. And again, a City Manager wishing to buck tradition, or believing the Chief School's programming was lackluster, could view attendance at such a program a liability. Regarding Plaintiff's tenure on the Department Command Staff, near identical conclusions apply: if tenure guaranteed the Chief position, the City Manager would lose her authority over the appointment process; tenure on the Department Command Staff could readily be viewed as a liability by a City Manager seeking to reshape the department. None of these qualifications are undeniable in their value, and none make Redding's decision appear pretextual. Accordingly, Plaintiff fails to create a convincing mosaic of discrimination as to the interim Chief position.

**b. Permanent Chief Appointment**

Plaintiff argues he has shown a convincing mosaic of discrimination by pointing to the fact that the majority of interview panelists knew Heard was the interim Chief, the fact that one panelist expressly stated he preferred to see a Black Chief, and again to Deriso's statements, this time suggesting they influenced the panelists. (Doc. 34 at 9). Plaintiff also suggests the fact Ms. Redding was chosen to be City Manager in the first place "evidences a systematically better treatment of similarly situated employees." (*Id.* at 10). Defendants respond by arguing none of these facts create a convincing mosaic of discrimination. (Doc. 58 at 5–7). As discussed previously in the Court's discussion of the *McDonnell Douglas* framework as applied to the permanent Chief position, the panelists' preference for Heard because he was interim Chief can be evidence of racial discrimination if Plaintiff successfully shows race discrimination in the interim appointment. Here, as above, Plaintiff failed to show race discrimination in the interim Chief appointment, meaning that there is no "taint" that can spread to the permanent appointment process.

Plaintiff argues that Redding being Black and selected for a job evidences systematically better treatment of similarly situated employees. This argument is likewise unpersuasive. Redding did not choose herself to be City Manager, the City Commission did. (Doc. 34-1 ¶ 39). So the individual choosing City Manager and Chief are different individuals. "[D]ifferences in treatment by different . . . decision makers can seldom be the basis for a viable claim of discrimination." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001). And Plaintiff does not point to some higher decisionmaker orchestrating the

replacement of white employees with Black ones.[10] As a result, this fact does not support a finding of race discrimination.

Plaintiff's argument regarding one panelist's racially discriminatory preference and Deriso's comments relate, so the Court addresses them together. Plaintiff points out that panelist Wells testified that he would prefer to see a Black Chief and that Deriso likely held a similar view. (Doc. 34 at 9). Importantly, Wells is the only panelist Plaintiff argues voted in accordance with Deriso's views. And the Court can easily find that, viewing the facts in the light most favorable to Plaintiff, that Wells cast his vote for Heard based on race discrimination. The standard for the Court's review bears repeating: Plaintiff's mosaic must be convincing, such that the evidence must allow a jury to reasonably infer that Plaintiff's protected characteristic was a but-for cause of Defendants' intentional discrimination. *See Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1197 (11th Cir. 2024). A jury could reasonably infer that Plaintiff's protected characteristic was a but-for cause of Wells's intentional discrimination. But Wells is not the defendant. He was but one of ten votes, which unanimously supported Heard for the permanent Chief position. And Plaintiff has not presented evidence that the other nine panelists voted in accordance with their own racial preference, nor according to Deriso's racially motivated preference. Based on the evidence in the Record, a reasonable jury could not find Wells's influence as a panelist so overwhelmingly persuasive as to transmute his race discrimination to the entire panel, and in turn, Redding's ultimate decision to follow the panel's recommendation in appointing Heard permanent Chief. Accordingly, Plaintiff fails to create a convincing mosaic of discrimination as to the permanent Chief position.

**c. Totality of Both Appointment Processes**

The Court now considers all evidence from both appointment processes to determine whether Plaintiff has shown a convincing mosaic of discrimination. The Record evidence shows as follows: a candidate for City Chairman campaigns on racially discriminatory statements and wins office, the City Commission votes to fire its white City Manager who is replaced by a Black person. Then, the Police Chief announces his resignation and the new City

[10] Plaintiff, of course, argues Deriso wants this to happen. But, as discussed herein, Deriso had no say in the selection of Chief, so any subjective desire on his part does not make this treatment systematic.

Manager must choose between two equally-ranked Captains. She chooses the Black Captain, for reasons which the Court has already established are not pretextual. She then assembles a ten-person panel to interview applicants for the permanent Chief position. That panel included a private citizen who said he wanted to see a Black Chief, clearly a racially discriminatory preference. That panel unanimously selects the Black Captain, in part because he is the interim Chief, and the City Manager follows the recommendation and appoints the Black Captain.

All in all, Plaintiff has shown that the City Chairman expressed racially discriminatory views while campaigning, and his public statements successfully influenced one interview panelist to follow his views. Given Deriso's lack of actual power over both appointment processes, the fact that only one in ten panelists acted according to racially discriminatory views, and that the final decisionmaking power rested with Redding, who offered a non-pretextual reason for her decisions, the Court readily finds that a jury could not reasonably infer Plaintiff's protected characteristic was a but-for cause of Defendants' intentional discrimination. Plaintiff has failed to show a convincing mosaic of discrimination.

*3. Cat's Paw Theory of Liability*

Plaintiff's final remaining option to show Title VII liability is through the cat's paw theory. Plaintiff argues that Deriso's discriminatory statements influenced Redding to racially discriminate against Plaintiff in the interim and permanent Chief appointments. (Doc. 34 at 5). "When a claim involves an adverse employment action that occurs based on a biased recommendation by a party without decision-making authority, a plaintiff can establish liability under the cat's paw theory." *Holley v. Ga. Dep't of Corr.*, 845 F. App'x 886, 889 (11th Cir. 2021). "Under that theory, if the decisionmaker," Redding, "followed the biased recommendation," Deriso's, "without independent investigation—essentially rubber-stamping the biased recommendation—then the recommender's discriminatory animus is imputed to the decisionmaker." *Id.* But an independent investigation may not always relieve an employer of fault. Instead, "discriminatory animus may be imputed to a neutral decisionmaker under a cat's paw theory if (1) a supervisor performed an act motivated by animus that was intended to cause an adverse employment action[,] and (2) the act was a proximate cause of the adverse employment action." *Id.* But, "there is no proximate cause—and therefore can be no liability—

if the adverse action is entirely justified apart from the biased supervisor's recommendation." *Id.*

Plaintiff does not seem to dispute that Redding conducted an independent investigation. Instead, he seeks to show proximate cause under a theory involving Deriso's tiebreaker role as City Chairman. The tiebreaker role means that whenever a motion before the City Commission fails to get three votes, Deriso, who would not otherwise cast a vote, was allowed to cast the tiebreaker vote. (Doc. 34 at 6). Plaintiff's theory argues that Redding depended so heavily on Deriso's City Chairman tiebreaker vote, that she necessarily adopted his racial animus in selecting a Black Chief.

Plaintiff's argument regarding the necessity of Deriso's tiebreaker vote appears to apply to both the interim and permanent Chief appointments, so the Court considers it in the context of both. First, Plaintiff cites to Deriso's previously discussed, racially discriminatory campaign statements. (Doc. 34 at 5). Second, Plaintiff asserts that around February 2022, the time of Heard's interim appointment, the City Commission "was down to three members plus the Chairperson (four total), dramatically increasing the likelihood of Deriso's vote [sic] would be needed to pass any motion." (*Id.* at 6). In other words, unless the three City Commission members voted unanimously on a motion, Deriso would get to cast a deciding vote. Defendants respond that Plaintiff's theory is speculative: Plaintiff does not offer any instance where Redding needed Deriso's tiebreaker vote; specifically, Plaintiff does not put forward evidence the tiebreaker vote was necessary for the interim Chief appointment.[11] (Doc. 58 at 3).

Plaintiff's argument about the tiebreaker vote speaks to the proximate cause method of showing a cat's paw theory: Plaintiff argues Redding's reliance on Deriso's tiebreaker vote proximately caused her to pass over Plaintiff for Chief, and that decision was motivated by Deriso's racial animus. "Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that [are] too remote, purely contingent, or indirect.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)). Plaintiff's link here is plainly

[11] Based on the Court's understanding of the record evidence, the City Commission did not vote on Redding's appointment of Heard; in other words, Redding had the final say both times she appointed Heard and did not require the Commission's ratification of her decision.

contingent: it depends on Redding actually needing Deriso's tiebreaker vote, a proposition for which Plaintiff produces no evidence. The mere fact the Commission was down to three members does not support the finding of a direct relation: those three members could have been completely aligned on every issue, rendering Deriso's vote perpetually useless. If Plaintiff had put on any evidence of Deriso's vote being necessary, the Court would be obligated to view it in the light most favorable to Plaintiff. But Plaintiff did not, so the Court cannot. Plaintiff's proposed link is plainly speculative. Without putting on evidence of some direct relation between Heard's appointment and Deriso's tiebreaker vote, Plaintiff's cat's paw theory cannot succeed via the proximate cause method. The Court will now analyze Plaintiff's cat's paw theory in the context of the interim and permanent Chief appointments each.

**a. The Interim Chief Appointment**

If Redding followed Deriso's biased recommendation without conducting an independent investigation, then Deriso's bias may be imputed to Redding and her decision as to the interim Chief appointment. *Holley v. Ga. Dep't of Corr.*, 845 F. App'x 886, 889 (11th Cir. 2021). Here, Plaintiff points to Deriso's statement that the day of Hathaway's resignation was a "good day" because Hathaway's appointment was caused by historic racism which Redding could now correct by appointing a Black Chief. (Doc. 34 at 5). That statement plainly represents a racially biased recommendation. However, Redding conducted an independent investigation: she met with a Captain (who is white and represented her first choice as interim Chief) who recommended Plaintiff and Heard. (Doc. 58 at 4). Then, she considered that recommendation and evaluated the candidates based on her personal experience: she chose Heard because he was the Captain she saw at public events with Hathaway, and who Hathaway had referred to as his "next in line." (*Id.*) Redding conducted an independent investigation, meaning she did not rubber-stamp Deriso's biased recommendation. Accordingly, Plaintiff has failed to make out the cat's paw theory of liability as to the interim Chief appointment.

**b. The Permanent Chief Appointment**

The same rules apply to the permanent Chief appointment: if Redding followed Deriso's biased recommendation without conducting an independent investigation, Plaintiff

may proceed under a cat's paw theory of liability.[12] Redding's independent investigation as to the permanent Chief appointment was even more thorough: she assembled a ten-person panel to interview finalists. (Doc. 31-1 ¶¶ 77–78). That panel did not include Deriso and he did not speak with any panelists about the candidates. (*Id.* ¶ 79). The interview panel discussed the candidates and unanimously selected Heard as their top choice for Chief. (*Id.* ¶¶ 83–84). Redding conducted a thorough, independent investigation before choosing Heard as permanent Chief. Accordingly, Deriso's biased recommendation may not be imputed to Redding, meaning Plaintiff cannot proceed under a cat's paw theory of liability.

**B. Qualified Immunity Protects Deriso from Suit**

Deriso asserts qualified immunity. (Doc. 31-2 at 11). Qualified immunity shields government officials from civil liability to the extent their conduct "does not violate clearly established statutory or constitutional rights" about which a reasonable official would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine balances two key interests: "(1) the need to hold public officials accountable when they exercise power irresponsibly and (2) the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* At the first step, an official must establish that he performed a discretionary function when the alleged constitutional violation occurred. *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (quotation marks omitted). Deriso asserts he acted within the scope of his discretionary authority, (Doc. 31-2 at 11), and Plaintiff does not dispute this argument. (Doc. 34 at 17–18). Accordingly, Plaintiff has waived this argument, and the Court finds that Deriso was acting within the scope of his discretionary authority.

At the second step, the burden shifts to Plaintiff to defeat qualified immunity. *See Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (citing *Mikko v. City of Atlanta*, 857 F.3d 1136, 1319 (11th Cir. 2017)). To do so, Plaintiff must meet two requirements. *See Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (citing *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199–1200 (11th Cir. 2007)). First, Plaintiff must sufficiently allege a constitutional violation. *Echols*, 913

[12] Plaintiff focuses his cat's paw arguments on the interim Chief appointment. Accordingly, it is unclear whether Plaintiff actually asserts a cat's paw theory as to the permanent Chief appointment. However, Plaintiff's alleged facts regarding Deriso's discriminatory statements apply to both appointments, so the Court will analyze both.

F.3d at 1319 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Second, Plaintiff must show that his violated right was "clearly established at the time[.]" *Id.* (quotation marks omitted) (quoting *al-Kidd*, 563 U.S. at 735).

Deriso asserts he violated no constitutional right. (Doc. 31-2 at 12). In doing so, Defendants unhelpfully simply refer back to their arguments in Paragraph B. (*Id.*) Fortunately, the law on this matter is quite clear: "Racially derogatory comments . . . are unprofessional and repugnant, but derogatory words alone do not violate the Constitution." *Jackson v. Sullivan*, No. 3:18-CV-784-WKW, 2018 WL 4742509, at *1 (M.D. Ala. Oct. 2, 2018) (first citing *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008); then *Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989); and then *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987)). *See also Watson v. Div. of Child Support Servs.*, 560 F. App'x 911, 914 (11th Cir. 2014) ("Because the Equal Protection Clause is concerned with discriminatory treatment or action, '[w]here the conduct at issue consists solely of speech, there is no equal protection violation.'" (quoting *Williams v. Bramer*, 180 F.3d 699, 705–06 (5th Cir. 1999))). Plainly, Deriso's discriminatory statements, standing alone, do not amount to a constitutional violation.

Plaintiff alleges Deriso's statements violated Plaintiff's right to contract. (Doc. 8 ¶ 65). "To state a claim under § 1981 for interference with a right to contract, 'a plaintiff must identify an impaired contractual relationship under which the plaintiff has rights.'" *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1309 (11th Cir. 2010) (quoting *Kinnon v. Arcoub, Gopman & Assocs.*, 490 F.3d 886, 890 (11th Cir. 2007)). But Deriso lacked decisionmaking authority over the Chief appointment process. And while Deriso clearly intended to impede Plaintiff's right to contract, Redding, as discussed previously, did not follow Deriso's biased recommendation. As a legal matter, Deriso's attempt to discriminate did not consequentially affect Redding's decisionmaking, nor was it the proximate cause of Heard's appointment, meaning Deriso did not actually impair Plaintiff's right to contract. Plaintiff offers various cases for the proposition that "it is categorically improper for the government to base decisions or official actions of any sort—particularly—upon race or racial considerations." (Doc. 34 at 17). Again, Deriso was not a decisionmaker. Plaintiff's precedents support findings of liability for situations where discrimination or discriminatory statements resulted in an adverse outcome. Deriso's had no such effect. Because Deriso's discrimination did not actually hinder Plaintiff's ability to make

or enforce a contract, Plaintiff has not made out a claim for actionable discrimination under § 1981 or the Constitution, meaning Deriso is entitled to qualified immunity. Because Plaintiff has failed to show a constitutional violation, the Court necessarily cannot, and need not, decide whether that right was clearly established. Therefore, Defendants' Motion for Summary Judgment (Doc. 31) is **GRANTED** as to Count I of Plaintiff's Complaint.

**C. Plaintiff Fails to Establish Municipal Liability**

Defendants argue that Plaintiff failed to establish municipal liability under *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). (Doc. 31-2 at 10). Plaintiff disagrees. (Doc. 34 at 15–16). A municipality is only liable when the municipality's official policy causes a constitutional violation. *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). As established above, there was no constitutional violation. However, the Court will proceed with the *Monell* analysis for the sake of thoroughness.

Plaintiff argues Cordele had an official policy of engaging in racially motivated hiring practices. (Doc. 34 at 16). However, Plaintiff's only evidence concerns Deriso's actions in the removal of City Manager McCarthy and his supposed influence over Redding in the appointment of Heard. (*Id.*) In so doing, Plaintiff correctly points out that "[a] municipality may be held liable for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision." *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996), *aff'd sub nom. McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, (1997). But then Plaintiff wrongly asserts that Deriso had final policymaking authority over the Chief appointment. This assertion is plainly false and contradicted by the Record evidence previously discussed. Redding had final policymaking authority over the Chief appointment. And Plaintiff failed to establish that Deriso influenced Redding in her decisionmaking on the Chief position. Plaintiff argues that Deriso engaged in a racially motivated hiring practice by ousting City manager McCarthy and replacing him with Redding. This may be the case, and it may be grounds for McCarthy to sue. But Plaintiff is not McCarthy. The final policymaker in Plaintiff's case was Redding. Plaintiff has not put forward evidence that Redding engaged in racially motivated hiring practices. Accordingly, Plaintiff has failed to establish *Monell* liability. Therefore, Defendants' Motion for Summary Judgment (Doc. 31) is **GRANTED** as to Count II of Plaintiff's Complaint.

*1. Plaintiff Fails to Establish a Mixed-Motive Discrimination Claim*

Plaintiff attempts to establish a mixed-motive discrimination claim, in the event his intentional race discrimination claim, discussed above, fails. (Doc. 8 ¶ 86). Defendants argue Plaintiff has not made the necessary showing to sustain a mixed-motive race discrimination claim. (Doc. 31-2 at 8–9). "An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quoting 42 U.S.C. § 2000e–2(m)). Defendants argue that Plaintiff must show Redding "actually relied on [Plaintiff's race] in making [her] decision." (Doc. 31-2 at 9) (quoting *Quigg*, 814 F.3d at 1235). Plaintiff does not meet this argument head-on, instead arguing that Defendants "made no attempt to show that they would have taken the same adverse actions . . . absent any discriminatory intent." (Doc. 34 at 14–15). Defendants correctly respond that Plaintiff's argument impermissibly shifts the burden onto Defendants. Indeed, Plaintiff bears the obligation to show that racial bias was a motivating factor for an adverse employment action. But he has presented no such evidence. Deriso made racially discriminatory statements but had no power over the Chief appointment process. Wells indicated race was a motivating factor in his vote as an interview panelist, but Wells's bias cannot be a valid motivating factor when nine other panelists voted unanimously for Heard.

Accordingly, Plaintiff has failed to meet his burden for a mixed-motive discrimination claim and the Court need not consider his "same decision" argument which impermissibly shifts the burden. Therefore, Defendants' Motion for Summary Judgment (Doc. 31) is **GRANTED** as to Count III of Plaintiff's Complaint.

## V. CONCLUSION

First, Plaintiff's Title VII Intentional Race Discrimination claim against the City of Cordele fails because Plaintiff cannot establish his claim under the *McDonnell Douglas* framework, the convincing mosaic metaphor, the cat's paw theory of liability, or the standard for a mixed-motive discrimination claim. Second, Plaintiff's § 1981 Intentional Race Discrimination claim against Defendant Deriso fails because Deriso is entitled to qualified immunity. Third, Plaintiff's § 1981 Intentional Race Discrimination claim against the City of

Cordele fails because Plaintiff cannot establish municipality liability on the part of the City. Fourth, Plaintiff waived his Title VII retaliation claim. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED**.

Further, the Motion for Summary Judgment having been granted, the Clerk is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff.

**SO ORDERED**, this 30th day of July 2026.

**/s/ W. Louis Sands**
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**